UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| MIDLAND NATIONAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>LISA J. MORRISON, SHAWN CUDMORE KREMER, IN HER CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GLEN D. CUDMORE, ALSO KNOWN AS GLEN DUWAYNE CUDMORE, ALSO KNOWN AS GLEN CUDMORE, DECEASED,<br><br>Defendants. | 3:16-CV-03002-RAL<br><br>OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

Plaintiff Midland National Life Insurance Company (Midland) filed this suit against Defendants Lisa J. Morrison and Shawn Cudmore Kremer seeking rescission of a life insurance policy issued to Glen D. Cudmore, and a declaratory judgment that it has no obligation under the policy other than the refund of premiums paid, plus interest. Doc. 1. Morrison is named as the beneficiary to the life insurance policy, and Kremer is the personal representative of Cudmore's estate. Doc. 1 at 1–2. Midland seeks to rescind the policy based on information about Cudmore's health that it learned during a two year contestability period following the policy's issuance. Doc. 1 at 5–8. Morrison timely filed an answer to the complaint, but when Kremer did not, Midland filed a motion for entry of default against Kremer. Docs. 8, 16. Midland then moved for summary judgment, as well as default judgment against Kremer. Doc. 22. For the

1

reasons explained below, this Court grants Midland's motion for summary judgment and default judgment.

I.     Facts[1]

During the last years of his life, Cudmore primarily received treatment from Dr. Margaret Upell and nurse practitioner Kathleen Zambo at the Upell Medical Clinic in Eagle Butte, South Dakota, visiting the office on an almost monthly basis.[2] Doc. 34 at ¶ 6; Doc. 27 at ¶ 18; Doc. 32 at ¶ 18. On August 13, 2012, Cudmore visited Avera St. Mary's Hospital in Pierre on the recommendation of nurse practitioner Zambo because of an "elevated PSA." Doc. 27-4 at 4. Dr. Joseph Wyatt reviewed a prostate-specific antigen (PSA) test done at Eagle Butte on August 2, 2012 that showed a level of 4.2. Doc. 27-4 at 4. Dr. Wyatt noted that a previous test done in February of 2012 showed a level of 2.9, and that prior records show readings "in between 2.5 and just above 4 throughout that time." Doc. 27-4 at 4. Dr. Wyatt concluded by noting that because the PSA level "as a trend is not going up or down," it "is reasonable to observe it which is what [Cudmore] wants to do." Doc. 27-4 at 7. Dr. Wyatt recommended another PSA in one year. Doc. 27-4 at 7.

On April 30, 2013, Cudmore returned to visit Dr. Wyatt in Pierre at the request of nurse practitioner Zambo because of a recent test showing a PSA level of 5.45. Doc. 27-4 at 12. Dr. Wyatt "lean[ed] the patient strongly towards what I would favor of doing a biopsy at this point."

---

[1] In accordance with Local Rule 56.1, Midland filed a Statement of Material Facts in support of its motion for summary judgment. Doc. 27. In response, Morrison filed her own Statement of Material Facts that answer Midland's facts. Doc. 32. This Court takes the facts in the light most favorable to the non-moving party, Morrison, in ruling on Midland's motion for summary judgment. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
[2] In 1978, Cudmore was seriously injured in a motor vehicle accident, resulting in hemiparesis of his right side, and significant head trauma. See Doc. 34 at 1; Doc. 35-2 at 1.

2

Doc. 27-4 at 15. Cudmore did not want a biopsy done at the time, and Dr. Wyatt ordered a follow-up PSA test for six months later.

On May 13, 2013, Cudmore returned to Pierre to have Dr. Wyatt perform a prostate biopsy. Doc. 27-4 at 19. On May 20, 2013, Cudmore met with Dr. Wyatt, who recorded in his medical record that the biopsy results revealed two of the samples having "atypical small acinar proliferation suspicious for but not diagnostic of malignancy." Doc. 27-4 at 23. At that meeting, Dr. Wyatt discussed with Cudmore a "followup PSA in six months time and if persistently elevated, we will repeat a biopsy at that point." Doc. 27-4 at 24.

On October 28, 2013, Cudmore again traveled to Pierre to meet with Dr. Wyatt because of an elevated PSA level found in a test done on October 8, 2013. See Doc. 27-4 at 25. At this meeting, Dr. Wyatt noted that "PSA remains mildly elevated; however, overall trend is decreasing. In light of this further observation for another six months with PSA at that time is recommended." Doc. 27-4 at 27.

On November 21, 2013, Cudmore applied for life insurance with Midland and signed Part I of Midland's General Purpose Life Insurance Application. Doc. 27 at ¶ 8; Doc. 32 at ¶ 8. The application included a variety of questions about Cudmore's health. See Doc. 27-1. Question 34(i) of the application asked whether the applicant has "been diagnosed by a licensed medical professional, treated or advised to get treatment from a licensed medical professional, hospitalized, or presently taking prescription(s) or medication(s) for . . . "Disorder of the kidney, bladder or urinary system, abnormal PSA [prostate-specific antigen], abnormal PAP smear without subsequent normal PAP smear or protein or blood in the urine." Doc. 27 at ¶¶ 10–11; Doc. 32 at ¶¶ 10–11. In the corresponding checkmark box on Cudmore's application, "No" was marked. Doc. 27 at ¶ 11; Doc. 32 at ¶ 11. Question 35(c) asked whether the applicant has "[i]n

the past 12 months been advised by a licensed medical professional to have a checkup, EKG, X-ray, blood or urine test or any other diagnostic test." Doc. 27 at ¶ 12; Doc. 32 at ¶ 12. "No" was checked for this question. Doc. 27 at ¶ 12; Doc. 32 at ¶ 12. For questions 34–37, any "Yes" answers must be supplemented with the date, diagnosis, treatment, results, and information of attending physician and hospital. Doc. 27-1 at 33. No additional information was provided in that section of Cudmore's Part I application. Doc. 27 at ¶ 13; Doc. 32 at ¶ 13. Part I of the application contained the certification before the signature block that "It is declared that statements and answers in this application, including statements by the Proposed Insured(s) in any medical questionnaire or supplement that become part of this application, are complete and true to the best knowledge and belief of the undersigned." Doc. 27-1 at 34. Morrison maintains that Cudmore did not fill in the answers to Part I himself, but does not dispute that Cudmore signed the bottom of Part I of the application. Doc. 32 at ¶ 10; Doc. 27-1 at 35.

As part of the application process, Cudmore had a paramedical examination and completed Part II of the application on December 11, 2013. Doc. 27 at ¶ 16; Doc. 32 at ¶ 16. Again, Morrison maintains that Cudmore did not fill in the answers to Part II himself, but does not dispute that Cudmore signed the bottom of Part II of the application. See Doc. 32 at ¶ 17. Question 2 of Part II asked about several diseases or disorders, and in conjunction with two "Yes" answers, nurse practitioner Zambo and Dr. Upell, both of Eagle Butte, SD, were disclosed as "Attending Physician[s]." Doc. 27-1 at 36; Doc. 27 at ¶ 17; Doc. 32 at ¶ 17. Question 2(i) of Part II specifically asked whether, in the past ten years, Cudmore had "ever had or been diagnosed by a licensed medical professional, treated or advised to get treatment from a licensed medical professional, hospitalized, or presently taking prescription(s) or medications(s) for . . . [d]isorder of the kidney, bladder or urinary system, abnormal PSA, abnormal PAP smear without

subsequent normal PAP smear or protein or blood in the urine." Doc. 27-1 at 36. The "No" box was checked for this question. Doc. 27 at ¶ 19; Doc. 32 at ¶ 19. Question 6 of Part II stated that "[i]f not listed above, please provide full name, address and phone numbers of licensed medical professional(s) consulted in the past five years, include date and findings of last visit and test performed and treatment received." Doc. 27-1 at 36. This space was left blank. Doc. 27 at ¶ 20; Doc. 32 at ¶ 20. Throughout the application, other aspects of Cudmore's other medical history, including a 1979 accident resulting in disability payments, were disclosed. See Doc. 27-1 at 36-37. The application contained an affirmative oath that: "The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application and are made to induce the Midland National Life Insurance Company to issue the policy or certificate applied for." Doc. 27-1 at 36. Cudmore signed Part II of the application. Doc. 27-1 at 38; Doc. 27 at ¶ 17; Doc. 32 at ¶ 17.

Following the application's submission, Midland assessed the mortality risk for Cudmore through its underwriting process. See Doc. 27 at ¶ 24; Doc. 32 at ¶ 24. This process determines the type of policy Midland is willing to offer, the appropriate death benefit, the premium rate, and the ultimate issuance of the policy. Doc. 27 at ¶ 24; Doc. 32 at ¶ 24. On January 10, 2014, Midland issued a life insurance policy to Cudmore, of which he accepted delivery on January 15, 2014, as Policy No. 1503084386. Doc. 27 at ¶¶ 27, 30; Doc. 32 at ¶¶ 27, 30. The policy has a face amount of $100,000, with Morrison designated as the sole primary beneficiary of the policy. Doc. 27 at ¶¶ 28–29; Doc. 32 at ¶¶ 28–29.

On April 28, 2014, Cudmore met with Dr. Wyatt in Pierre because of an elevated PSA level, which was lower than at the time of the prior biopsy, but still "not back to a normal level." Doc. 27-4 at 28. Dr. Wyatt noted that the follow up was for "both history of elevated PSA and

also abnormal biopsy." Doc. 27-4 at 28. While Dr. Wyatt thought a second biopsy was "the optimal plan," Cudmore wanted to "pursue ongoing followup," and a PSA test was recommended every six months. Doc. 27-4 at 31.

On October 1, 2014, Cudmore returned to Pierre because of a PSA level "elevated to 6.5." Doc. 27-4 at 32. Dr. Wyatt "quite bluntly recommended that he have a repeat biopsy at this point," but Cudmore elected to have only a follow-up PSA exam in six months. Doc. 27-4 at 32.

On July 6, 2015, Cudmore met with Dr. Wyatt in Pierre to follow up concerning his elevated PSA level. Doc. 27-4 at 38. Dr. Wyatt noted in his care chart that Cudmore expressed at this meeting "that even if it is higher he is going to refuse biopsy." Doc. 27-4 at 39. Later, Melissa Simons, an R.N. at Avera St. Mary's Hospital in Pierre called Cudmore to tell him the PSA level had "decreased to 6.39." Doc. 27-4 at 41. Simons noted that he declined a prostate biopsy, but will return for another PSA check in six months. Doc. 27-4 at 41.

On August 16, 2015, Cudmore died in an ATV accident, and on September 10, 2015, Morrison submitted the appropriate paperwork to claim the death benefit proceeds. Doc. 27 at ¶¶ 33–34; Doc. 27-2 at 2; Doc. 32 at ¶¶ 33–34. The policy contains an incontestability provision: "We cannot contest this policy after it has been in force during the Insured's lifetime for 2 years from the Policy Date or, if reinstated, for two years from the date of reinstatement." Doc. 27 at ¶ 32; Doc. 32 at ¶ 32. Following Morrison's claim, Midland conducted a routine contestability investigation, as Cudmore's death occurred within two years from the policy's effective date. Doc. 27 at ¶ 36; Doc. 32 at ¶ 36. During the course of this investigation, Midland obtained medical records relating to Cudmore involving his elevated PSA levels and the

subsequent biopsy to determine whether the elevated PSA levels were related to prostate cancer. Doc. 27 at ¶¶ 38, 41; Doc. 32 at ¶¶ 38, 41.

On January 11, 2016, Midland sent letters to both Morrison and Kremer stating that because "Cudmore did not disclose his complete medical history . . . the Company did not have a proper opportunity to evaluate him as an insurance risk," and had he disclosed his full history, Midland "would not have offered him life insurance coverage under the Policy, and would not have issued the Policy." Doc. 27-1 at 41–46. Midland alleged that Cudmore "materially misrepresented his medical history" during the application, and "[a]s such, we are exercising our right to rescind the Policy, deeming it null and void. The extent of our liability is limited to the return of all premiums paid into the Policy, plus interest." Doc. 27-1 at 41–46. Along with the letters, Midland sent a copy of the complaint filed with this Court, which seeks rescission of the life insurance policy "based on Mr. Cudmore's misrepresentation and omission of material facts." Doc. 27-1 at 41–46.

Midland's complaint alleges that "[t]he false statements, misrepresentations, omissions, incorrect statements made and facts concealed and/or failed to be disclosed by Mr. Cudmore in Parts I and II of the Application were fraudulent or intentional misrepresentations of material fact." Doc. 1 at ¶ 31. Because of this, it asserts that it would have declined Cudmore's application had it known the "true facts." Doc. 1 at ¶ 33. Midland's two count complaint seeks rescission of the policy and an accompanying declaratory judgment. See Doc. 1. Following an answer by Morrison, Doc. 8, and a clerk's entry of default as to Kremer, Doc. 17, Midland moved for summary judgment and default judgment under Rules 56 and 55(b) of the Federal Rules of Civil Procedure, Doc. 22. Midland argues it is entitled to summary judgment because there is no dispute as to facts establishing that had it known Cudmore's "true and complete

health history," it would not have issued him a policy, and that "Cudmore's material misrepresentations allow Midland National to rescind the life insurance policy under SDCL § 58-11-44." Doc. 22 at 2. Morrison opposes the entry of summary judgment, asserting that there are two issues for trial: 1) "Did Mr. Cudmore make any false statement?" and 2) "Were the statements made by Mr. Cudmore material under all the circumstances?" Doc. 32 at 10. Kremer has filed no answer and no documents to contest Midland's motion.

**II.    Standards of Review**

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). On summary judgment, the facts and inferences drawn from those facts must be viewed in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curium). Undisputed facts must be presented by citing to materials in the record, including depositions, affidavits, and other sworn or certified evidence, and the parties usually cannot rely on the pleadings alone. Fed. R. Civ. P. 56(c)(1), (e); Celotex Corp., 477 U.S. at 324. "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (quoting Krenik v. Cty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995)). "A mere scintilla of evidence is insufficient

to avoid summary judgment;" the evidence must be "significantly probative" in establishing a genuine issue of material fact to avoid summary judgment. Moody v. St. Charles Cty., 23 F.3d 1410, 1412 (8th Cir. 1994).

This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332(a)(1), because Midland is incorporated and has its principal place of business in Iowa, because both Morrison and Kremer, in her capacity as personal representative of Cudmore's estate, are domiciled in South Dakota, and because the amount in controversy in the case is above the $75,000 threshold. Claims brought under diversity jurisdiction in federal court are determined based on the substantive laws of the state within which the court resides. Secura Ins. v. Horizon Plumbing, Inc., 670 F.3d 857, 861 (8th Cir. 2012). This includes the state's conflict-of-law rules. Drinkall v. Used Car Rentals, Inc., 32 F.3d 329, 331 (8th Cir. 1994). South Dakota courts apply the Restatement (Second) of Conflicts of Laws to determine which state's substantive laws apply in the interpretation of a contract. See Dunes Hosp., LLC v. Country Kitchen Int'l, Inc., 623 N.W.2d 484, 488 (S.D. 2001); Stockmen's Livestock Exch. v. Thompson, 520 N.W.2d 255, 257 (S.D. 1994). Section 187 of the Restatement (Second) Conflict of Laws states that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied." Midland's policy does not include a provision specifying which state's law governs the policy. See Doc. 27-4 at 13–39. The Supreme Court of South Dakota has ruled that "[a] contract must be construed in accordance with the law of the place where made unless it is shown that it was the intention of the parties to be bound by the law of some other place." Briggs v. United Servs. Life Ins. Co., 117 N.W.2d 804, 807 (S.D. 1962). Here, Cudmore signed Parts I and II of the application in South Dakota, the paramedical exam was done in South Dakota, and the policy receipt was delivered to and signed by Cudmore in South Dakota. See

Luze v. Zurich Am. Ins. Co., No. CIV 16-4017-KES, 2016 WL 6581198, at *2 (D.S.D. Nov. 4, 2016). This Court has no evidence to suggest that the parties intended to be bound by any law other than South Dakota law so South Dakota law should apply. Doc. 33 at 6.

**III. Discussion**

Midland only learned of the allegedly material misrepresentations of Cudmore's medical history during a review that occurred within the two year contestability period under the insurance policy. See Doc. 27 at ¶¶ 36–37; Doc. 32 at ¶¶ 36–37. In South Dakota, an insurance carrier during the contestability period can review and revoke the policy even if the alleged misrepresentation on the application is not related to the cause of the insured's death. See Bushfield v. World Mut. Health & Accident Ins. Co., 123 N.W.2d 327, 329 (S.D. 1963) ("It is clear that a false representation as to a material matter renders a policy voidable without showing . . . that the misrepresentation had a causal connection with the disability claimed under the policy."); compare SDCL § 58-11-44 (2011) (misrepresentation on application only prevents recovery under three circumstances); with Mo. Ann. Stat. § 376.580 (West 2008) (misrepresentation on life insurance contract can only void the contract if "the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable"); see also Franklin L. Best, Jr., § 6.3 Materiality, Life & Health Ins. Law (2nd ed. 2016) ("It is not necessary, in the absence of a statute so requiring, that the misrepresentation relate to a matter which caused the death or other loss.").

Midland claims that it is entitled to rescind the policy based on SDCL § 58-11-44:

> All statements and descriptions in any application for an insurance policy, certificate, or annuity contract, by or on behalf of the insured or annuitant, shall be deemed to be representations and not warranties. No misrepresentation, omission, concealment of fact, or incorrect statement prevents a recovery under the policy or contract unless:

(1) Fraudulent or an intentional misrepresentation of a material fact; or

(2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

SDCL § 58-11-44. Midland argues that Cudmore's application contained misrepresentations that were material to the acceptance of the risk and the hazard assumed by the insurer, subpart (2), and that the misrepresentations were fraudulent or intentional, subpart (1). Doc. 26 at 17–18.

**A. Misrepresentations**

The first question here is whether any application responses, signed by Cudmore, were false or misleading in a way to qualify as misrepresentations within the meaning of § 58-11-44. "Generally, the question of whether an applicant's statements were false or misleading is a jury question[,] [b]ut when the facts are not in dispute . . . courts can decide this question as a matter of law." De Smet Farm Mut. Ins. Co. v. Busskohl, 834 N.W.2d 826, 831 (S.D. 2013) (alterations in original) (quoting Bennett v. Hedglin, 995 P.2d 668, 671 (Alaska 2000)). The content of Cudmore's life insurance application and medical records is not subject to genuine dispute.

Morrison makes two general arguments as to why Cudmore did not make any misrepresentations or false statements on his life insurance application: first, that Cudmore was told that he had an "elevated" PSA, which is not the same as the "abnormal" PSA asked about on the application; and second, that because his main medical providers were Dr. Upell and nurse practitioner Zambo, his other medical care came from referrals and Dr. Wyatt's information did not need to be disclosed. Additionally, although not directly argued as a reason why there may

11

be a question of fact on whether Cudmore made any false statement, Morrison points out that Cudmore did not fill in the application himself, though he did sign the application, and that Midland "must show that the type of statements enumerated by SDCL 58-11-4[4] were in fact made by Mr. Cudmore." Doc. 34 at ¶ 5; Doc. 33 at 3, 5, 8. Morrison does not allege[3] that an agent of Midland changed the answers given by Cudmore on the application, or that Midland's agent knew the answers given by Cudmore were false or incomplete.[4] The fact that Cudmore may not have filled in the answers on the application himself does not create a genuine issue of material fact because Cudmore signed both parts of the application, each part containing a certification as to the truthfulness of each answer and requiring him to update the application with any changes, and Morrison does not contest that Cudmore signed both parts of the application. See Doc. 32 at ¶¶ 10, 15, 17, 22; see also Life Benefit, Inc. v. Elfring, 7 N.W.2d 133, 134 (S.D. 1942) (answers on application "written down by a soliciting agent of the company," and then signed by applicant); Herdman v. Nat'l Reserve Life Ins. Co., 209 N.W.2d

---

[3] Morrison does state that "[e]xactly what went on during the application process is unknown to Morrison since Mr. Cudmore is deceased, and she was not present at the time the application was completed." Doc. 33 at 3–4. Morrison also questions why no physician names were listed in Part I of the application, because "[c]ertainly, a man who saw doctors every month of his life . . . to deal with serious physical problems he suffered from would be expected to and undoubtedly did know the names of his physicians. The person who completed the application itself would be the only person who could theoretically respond to that question at the present time." Doc. 33 at 5.

[4] South Dakota has recognized the general rule that an applicant is not responsible for answers falsified by an insurer's agent, but has found that if an insured receives a copy of the application along with the delivered policy and discovers the false statements, it is the insured's responsibility to notify the insurer of the false statements, or "become a participant in their fraud." Norwick v. United Sec. Life Co., 152 N.W.2d 439, 444 (S.D. 1967). South Dakota has also recognized that knowledge held by an insurer's agent about an applicant that may increase the risk is knowledge of the insurer, Williams v. Black Hills Benefit Life Ass'n, 19 N.W.2d 769, 770 (S.D. 1945), but this "assumes the existence of entire good faith on the part of the insured together with an absence of circumstances that could impute knowledge that the insurer would be deceived by the application," Braaten v. Minn. Mutual Life Insurance Co., 302 N.W.2d 48, 51 (S.D. 1981).

12

364, 365–66 (S.D. 1973) (answers on application given by the applicant, inserted into the application by a doctor after a physical examination, and then signed by applicant).

Morrison first argues that because nowhere in Cudmore's medical records do his physicians refer to his PSA as "abnormal," Cudmore knew only that he had an "elevated" PSA level, while Midland's application uses the word "abnormal."[5] According to Morrison, this "represents a genuine issue of material fact as to whether or not Mr. Cudmore would have thought his PSA was 'abnormal' as opposed to simply elevated," particularly because his PSA levels were declining, "a biopsy was performed showing no malignancy," and he was not required to have any further treatment. Doc. 33 at 6–7. The facts taken in the light most favorable to Morrison could leave a genuine issue of material fact on whether Cudmore thought that an "elevated" PSA level qualified as an "abnormal" PSA, and thus whether he was misrepresenting his condition in answering question 34(i).

However, regardless of whether Cudmore thought that an "elevated" PSA was different from an "abnormal" PSA, Cudmore answered "no" to question 35(c), which asked whether he had "[i]n the past 12 months been advised by a licensed medical professional to have a checkup, EKG, X-ray, blood or urine test or any other diagnostic test." Doc. 27 at ¶ 12; Doc. 32 at ¶ 12. About six months before Cudmore filled out this part of the application, he had been recommended for, and had undergone, a biopsy of his prostate, which cannot reasonably be

---

[5] Morrison cites to the case of Norris v. World Insurance Co., 63 N.W.2d 804 (S.D. 1954) in her argument of this point. Doc. 33 at 7. In Norris, the South Dakota Supreme Court considered whether an applicant previously diagnosed with acute arthritis misrepresented facts on his application when stating that he had never had rheumatism. The court quoted from Price v. Phoenix Mutual Life Insurance Co., 17 Minn. 497, 518 (1871) that "[i]f there was any ambiguity in the question so that its language was capable of being construed in an ordinary, as well as in a technical sense, the defendant can take no advantage from such ambiguity." 63 N.W.2d at 806. The ultimate decision in Norris, however, was that "[w]e cannot as a matter of law say that acute arthritis could not be considered to have been included within the meaning and the scope of question 12 of the application." Id. at 807.

13

considered anything other than a "diagnostic test." See Doc. 27-4 at 19. There is no genuine issue of material fact that Cudmore's failure to disclose his prostate biopsy in response to question 35(c) was a misrepresentation made on the insurance application within the meaning of SDCL § 58-11-44.

Morrison next argues that Cudmore considered only Dr. Upell and nurse practitioner Zambo to be his treating physicians, because "[o]ther health care professionals he saw were simply their consultants or helpers," and thus that he did not make any false statement by failing to list Dr. Wyatt on the application. Doc. 33 at 4, 7. However, "[i]t is settled law in this jurisdiction that a false representation as to a material matter in an application for insurance, even absent a showing of an intent to deceive, renders the policy voidable, because an insurer is entitled to rely on the truthfulness of the answers given. Braaten v. Minn. Mut. Life Ins. Co., 302 N.W.2d 48, 50 (S.D. 1981). In Braaten, the South Dakota Supreme Court found that answers on a life insurance policy that failed to list each of the names, addresses, and dates of treatment for specific attending physicians, even though some physicians and illnesses were disclosed, were "misrepresentations, omissions and concealments of fact." Id. at 51 (finding these were likely fraudulent, but even if not, were material under SDCL § 58-11-44). Here, regardless of whether Cudmore thought Dr. Wyatt was only a "consultant" or "helper" to Dr. Upell and nurse practitioner Zambo, he traveled to Pierre to meet with Dr. Wyatt on five separate occasions prior to filling out Midland's application, and Dr. Wyatt performed a prostate biopsy on him about six months prior to when Cudmore applied for the policy. See Doc. 27-1. Failure to list Dr. Wyatt on Midland's application was a "misrepresentation, omission, and concealment of fact" within the meaning of SDCL § 58-11-44.

**B. Materiality of Misrepresentations**

14

It is a question of law for the court to determine whether a misrepresentation is material "[w]here the application for an insurance policy is made the basis of the insurance contract, is attached to and made a part of the contract, and there are misrepresentations in the answers of the applicant to the questions in such application, and it appears from the record that reasonable minds could not differ on the question as to whether the matter misrepresented increased the risk of loss." De Smet, 834 N.W.2d at 834 (alteration in original) (quoting Herdman v. Nat'l Reserve Life Ins. Co., 209 N.W.2d 364, 368 (1973)). A misrepresentation is considered material in an insurance application "if it is such as would reasonably influence the decision of the insurer as to whether it would accept or reject the risk." Herdman, 209 N.W.2d at 368 (quoting Ivory v. Reserve Life Ins. Co., 101 N.W.2d 517 (S.D. 1960)).

Although this Court was not presented with, and could not find, specific South Dakota authority relating to the materiality of the disclosure of a prostate biopsy in an application for life insurance, authority supports a finding of materiality when there has been a misrepresentation by failing to disclose a treating physician or other health issues. See Braaten, 302 N.W.2d at 51 (material misrepresentation for applicant to answer "yes" pertaining to questions regarding recent hospitalization, but not list two hospitalizations or physicians consulted related to excessive alcohol use); Herdman, 209 N.W.2d at 368–69 (material misrepresentation for life insurance application to fail to disclose diagnosis of heart disease, high blood pressure, multiple examinations, and EKG scans); Hohenthaner v. Mut. Life Ins. Co., 250 N.W. 370, 371 (S.D. 1933) (failing to disclose a medical examination and physician's name on a life insurance application considered fraudulent sufficient to void the policy because the statements "related to the condition of his health at the time of the application and at the time of the issuance and delivery of the policy, and were material"); Smith v. Fed. Sur. Co., 243 N.W. 664, 670 (S.D.

1932) ("[A] misrepresentation of a material fact in reliance on which a contract of insurance is issued avoids the contract, whether the representation was made intentionally and knowingly or through mistake and in good faith.").

Along with its motion for summary judgment, Midland filed a declaration from Roger Hofer, an associate chief underwriter with Midland. Hofer reviewed Cudmore's medical records, applied Midland's underwriting guidelines and his "knowledge, training, experience, and judgment," and determined that if Cudmore had not made misrepresentations and had disclosed his full and completed health history, Midland would not have issued a life insurance policy to Cudmore. See generally Doc. 27-1. Specifically, Hofer stated that Midland relies on an insured's application to determine whether the applicant is insurable under its underwriting guidelines. Doc. 27 at ¶ 57; Doc. 32 at ¶ 57. Hofer declared that under Midland's guidelines, because Cudmore had one set of biopsies performed on his prostate while he was between the ages of 55 and 70 resulting in an "atypical small acinar proliferation," Midland would have declined coverage and not issued the policy. Doc. 27 at ¶ 60; Doc. 32 at ¶ 60; Doc. 27-1 at 10. A portion of Midland's underwriting guidelines were attached to Hofer's declaration and confirm this statement. See Doc. 27-1 at 57. Hofer declared that these underwriting guidelines were standard in the life insurance industry. Doc. 27 at ¶ 62; Doc. 32 at ¶ 62; Doc. 27-1 at 10.

Morrison has presented no evidence that Cudmore's failure to disclose his prostate biopsy and having seen Dr. Wyatt were not material to Midland's decision to issue Cudmore a policy. Morrison instead argues that because Cudmore substantially complied with the insurance application by listing Dr. Upell and nurse practitioner Zambo, Midland could have inquired earlier to learn of Cudmore's treatment with Dr. Wyatt, and found the records pertaining to Cudmore's PSA levels and biopsy. Doc. 33 at 8. Morrison cites to Stemler v. Stemler, 141

16

N.W. 780, 783 (S.D. 1913) (substantial compliance doctrine recognized manner of altering beneficiary in life insurance contract), Trautman v. Trautman, 713 N.W.2d 600 (S.D. 2006) (same), and Eide v. S. Surety Co., 226 N.W. 555, 556 (S.D. 1929) (substantial compliance doctrine recognized in submitting proofs of loss to insurance company). These cases do not extend the doctrine of substantial compliance to SDCL § 58-11-44, and there is no suggestion in South Dakota law that the Supreme Court of South Dakota would do so. Indeed, the existence of SDCL § 58-11-44 seems to allow for human error in the application process, so long as that error does not meet one of the three exempted subsections. Here, there is no genuine issue of material fact that Cudmore's misrepresentations increased the risk of loss to Midland. Accordingly, Cudmore's misrepresentations in his application for life insurance were material to Midland's acceptance of the risk, satisfying SDCL § 58-11-44(2).[6]

**C. Default Judgment**

Along with its motion for summary judgment, Midland filed a motion for default judgment against Kremer under Federal Rule of Civil Procedure 55(b). Doc. 22. Under Rule 55, "[w]hen a party 'has failed to plead or otherwise defend' against a pleading listed in Rule 7(a), entry of default under Rule 55(a) must precede grant of a default judgment under Rule 55(b)." Johnson v. Dayton Elec. Mfg. Co., 140 F.3d 781, 783 (8th Cir. 1998). Default judgments are disfavored, and not appropriate when there has been only a "marginal failure to comply with the time requirements." Time Equip. Rental & Sales, Inc. v. Harre, 983 F.2d 128, 130 (8th Cir. 1993). Default judgment is appropriate when there has been a "willful violation[] of court rules, contumacious conduct, or intentional delays." Ackra Direct Mktg. Corp. v. Fingerhut Corp., 86 F.3d 852, 856 (8th Cir. 1996) (quoting Harre, 983 F.2d at 130).

---

[6] Under South Dakota law, "an insurer is only required to prove one of the subparts enumerated in SDCL 58-11-44." De Smet, 834 N.W. 2d at 834.

17

On January 8, 2016, Kremer's then-attorney Lisa M. Von Wald executed a waiver of service on behalf of Kremer, giving her sixty days to file an answer to the complaint. Doc. 5. Having received no answer, Midland filed a Motion for Entry of Default against Kremer on August 24, 2016, under Rule 55(a) of the Federal Rules of Civil Procedure. Doc. 16. This entry of default as to Kremer was filed by the Clerk of Court on August 26, 2016, and notice of such was mailed to Von Wald on the same day. Docs. 17, 18. The Joint Form 52 Report of Parties' Planning Meeting filed on May 4, 2016 states that "[p]rior to the conference, the attorney who signed the Waiver of the Service of Summons on behalf of [Kremer] . . . notified Midland National's counsel that she would not be representing Ms. Kremer in this matter or participating in the Rule 26(f) conference and that Ms. Kremer would not be participating in the Rule 26(f) conference." Doc. 11 at 1–2. Kremer's failure to answer the complaint after receiving notice of the complaint, executing a waiver of service through counsel, and receiving notice of the Clerk's entry of default, amounts to willful conduct justifying entry of judgment by default against Kremer.

IV.   **Conclusion**

For the reasons explained above, it is hereby

ORDERED that Plaintiff's motion for summary judgment, Doc. 22, is granted. It is further

ORDERED that Plaintiff's motion for a default judgment against Defendant Kremer, Doc. 22, is granted. It is finally

ORDERED that Midland either deposit with the Clerk of Court a refund of all premium payments made on the policy, plus interest, to be distributed by the Clerk of Court in accordance

with further order of this Court or pay that amount directly to Morrison and/or Cudmore's estate if the parties so agree.

DATED this 16th day of August, 2017.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE